Good afternoon everyone, Judge Cross and I are joined today by Judge Greenberg by audio. Judge Greenberg, can you hear us? I can hear you. Can you hear me? We can hear you. Okay. Welcome, and we're sorry we're not going to be able to see you personally. I'm sorry too. I wish I could have been there. Okay, and with that, we'll call the first case, United States of America v. Dominic Jackson. Mr. Brodin. Good afternoon. May it please the Court. I'm Clinton Brodin. I represent Dominic Jackson. I might reserve two minutes for rebuttal. That request will be granted. My plan today really is to address two issues. The first is the jurisdictional issue of the Pennsylvania courts being able to authorize the tapping of phones outside the Commonwealth. And then the second issue is regarding the government repeatedly calling the case agent to give interpretations of phone calls in the case. With regard to the first issue, there were six telephone calls and one text message that's relevant. Two telephone calls were played, intercepted telephone calls were played at trial between Mr. Jackson and Arthur Brown, and they came from a state warrant. But the phones were located in Texas outside the Commonwealth when the recordings took place. And then the other four calls in the text message are from Arthur Gilbert and Mr. Jackson, and they were based on a federal warrant, but the federal warrant was fruit of the state warrant, which relied on the out-of-Commonwealth telephone calls. Mr. Brodin, to the extent there's any ambiguity in the term within the Commonwealth in the statute, why isn't that cleared up by the definition of intercept, where the amendment identifies the salient location as the point at which the contents of the communication are monitored by investigative or law enforcement officers? I understand the state's argument, and it's correct to a point. If you read that statute, yes, under the statute they can probably do that, but that's not really the issue here. Tom, the state cites a lot of federal cases from the different circuits that say it's all right for a federal judge in one district. The state's not a party at all. It's the U.S. that's arguing it. Right. Oh, I'm sorry. The government cites a bunch of federal cases that talk about out-of-district telephone conversations. What I just cited is coming from the Pennsylvania Code. You're suggesting that because there was some exceeding of state law under the state statute, that that rendered the calls that were obtained by the state wiretap invalid, and that that somehow tainted the Title III wiretap? And I guess where our focus is on is sort of the fundamental understanding of our Republic and the comedy between states. Could the Commonwealth of Pennsylvania enact a statute that allows the state of Pennsylvania to arrest people in California? Could they enact a statute which allows for service of process in Georgia? Are you trying to attack the statute here, or are you attacking the state wiretaps? I am saying that the state wiretaps, because they exceed what is allowed in our Republic, violate the Fourth Amendment Constitution. Go ahead. Do you agree, then? So do you concede that the Pennsylvania Code, via that definition of intercept, does on its face authorize Pennsylvania law enforcement officers within Pennsylvania to intercept calls that are taking place including outside of Pennsylvania? Given the reference to the definition that the government provided in its brief, yes, I do concede that. So your argument is that the Pennsylvania statute is facially unconstitutional because of federalism concerns? Federalism concerns makes it unauthorized under the Fourth Amendment to allow for the wiretapping of phones when they're outside the Commonwealth, yes. Counselor, the calls were made from Texas to where? The calls between Brown and Jackson, they were both in Texas. Well, how is that done physically? Where is the tapping mechanism set up? Well, the intercept room, all the evidence says, and I have no reason to doubt it, was in Pennsylvania. As far as the mechanics of it, I tried to get an answer to that, and frankly, it may be above my science grade, but I don't know how the actual tapping works. Well, in a way, I thought that's what you were trying to attack. What you're saying is it's physically possible for somebody to be sitting in a room in Pennsylvania and tap an intrastate, we'll call it, or call from two places in Texas, a place in Texas to another one. Yes, and in fact, a couple of the federal cases, the Connell Flores case cited by the government and the Cosme case cited in my brief, one involves a Texas wiretap, the other a California wiretap, they were actually tapping phones in Mexico. The United States government was tapping phones in Mexico. Well, of course, that's Title III now, and you make some arguments that relate to Title III, but as I understand, the crux of your argument goes to the jurisdictional basis of the state wiretaps. Right, but I suggest those federal cases are important because they're the same, by analogy, it's the United States versus another country, whereas it's Pennsylvania versus another state, and the federal cases say, well, you can't just tap any old phone in Mexico. The only reason you're allowed to tap, the only reason the wiretaps in those cases were upheld is because they hit at cell power in the United States because it was close to the border and the closest telephone cell power was in the United States. Okay, these particular phones, the Gilbert phone and the Brown phone, right? Correct. What were their area codes, if you know? The Brown phone was a Pennsylvania area code registered to a woman, I believe, in Pennsylvania, or registered to somebody in Pennsylvania. The Gilbert phone was a Pennsylvania area code, but registered to Gilbert in Georgia. Okay, so you had, I know a little bit more about the technology, but I'm not going to argue your case for you, but you answered part of my question by indicating that they were Pennsylvania area code phones. But isn't the key here, isn't the key here, is not so much the technology, and the intercept under the definition applies to the listening post, and I think that you can see it in your brief that, quote, the listening post was somewhere within Pennsylvania where the agents were sitting listening. In fact, it's probably not too far away from here, although it was a western case, so it may be closer to Pittsburgh. But it seems to me that the key to whether or not the state taps were permissible, as they relate to this case, is whether or not they were in furtherance of an investigation over which the state authorities had jurisdiction. Well, I guess I disagree with that. that the state of Pennsylvania might be investigating a drug case, but if Mr. Jackson was prosecuted in state court, the state of Pennsylvania could not go and arrest him in the state of Texas. Well, they might not be able to go to arrest him in the state of Texas, but what happened, I'm sure, in this case and in many other cases, even though Jackson may have been in Texas at that time, there must have been activity in Pennsylvania that involved Jackson's phone that resulted in the application for electronic surveillance, which was submitted to the Superior Court of Pennsylvania. I think that's right. That is correct. And the fact that he may have been in Texas when he made that call is irrelevant to the legitimacy of the wiretap under Pennsylvania law. If you were going to allow one state to authorize wiretaps in other states. Yeah, and it looks to me that under the law, a fair reading of the text and the definition of intercept is that so long as the actual listening post was within the jurisdiction of Pennsylvania, it's permissible under Pennsylvania law. Well, but then we come back to can Pennsylvania enact a statute that allows them to go and arrest people in the state of Georgia? Well, they may be able to. They may need to seek extradition to actually get the body, but if it relates to a case that had a nexus to Pennsylvania, I think the answer to that question is yes. So they have to go through a judge in the state of Georgia to do the jurisdiction? Well, they may have to go through a judge in Georgia to get the extradition, but they would go through a judge in Pennsylvania to get the approval for the electronic surveillance. My problem with your argument, although it's academically an interesting one, is that you don't cite any cases to us that would seem to say that a state, whether it be Pennsylvania or another state, was not permitted to listen to this conversation between two people in Texas coincidentally talking on 412 area code phones, although one being registered in Georgia. But I'm not sure that means much at all. But there's no case law. There is case law. By analogy, the two federal cases that involved the tapping of phones in Mexico says the United States can't go into Mexico. The only reason that's outside their jurisdiction, the only reason the United States is allowed to tap the phones in Mexico is because they contacted a cell tower in the United States because they were so close to the border. That, by analogy, the United States going into a different country is fairly analogous to one state going into another state. But the listening post here, the interception, is taking place within Pennsylvania. Why isn't that the right analogy? Because the – and, again, I can't tell you all the science to it, but nothing is – they're really hijacking the conversation. The conversation is in Texas. It's hitting cell towers in Texas, and they are hijacking the conversation to take it into Pennsylvania. I suppose the United States could hijack a conversation in Mexico to take it in the United States. I think you have an interesting argument. I'm not saying a correct argument, but I think you have an interesting argument. But I'm not sure that there's a jurisdictional foundation for the initial order to get to surveillance that under Pennsylvania law or under any federal law that you can point to us. I think the case that you're pointing to us is distinguishable because we're within the borders of this country. So that's my opinion, but we'll take a close look at it. You had a second point you wanted to talk about. I do, and that involves the fact that the government called their case agent seven times in the stand to interpret the different phone calls. Both the phone calls Jackson were involved in and then the other ones. One, the agent would be asked, what's going on in this call? Who were they speaking about? Describe the call to the jury. In fact, one, Exhibit 87, he goes on to say, this describes the entire conspiracy, and that's one of the phone calls between Arthur Gilbert and the defendant. There was an objection raised below, so we're reviewing for plain error, and one of the things that we need to see is that there was prejudice. There's some effect on substantial rights. Given that there were other witnesses at trial, including Bostic and Stanley, who also, for example, identified who Dom was. Both co-operators, yes. Both co-operators, but the point is that that interpretation, what you're suggesting was improper lay witness testimony from a law enforcement officer, was redundant of other witnesses. How, under those circumstances, could we find that it affected substantial rights that there was plain error here? Well, it's interesting because the government, in one hand, argues harmless error, and the other, page 42 of their brief says, the trial became a credibility battle between Bostic and Stanley on one hand and Jackson on the other. And so you have two people with every incentive to lie. I mean, they're co-operators. The Hampton case from the D.C. Circuit, same sort of situation. They had co-operators testifying, so I guess it's a question of whether just the testimony of the co-operators would be a harmless error, in other words. I might submit to you that the jury would certainly have reason to question co-operators, and I think the phone calls are actually what sort of. But isn't your argument here that it's the testimony of Agent Countryman that was not harmless? The fact that there's co-operators who provide the same testimony is what makes Countryman's testimony, even if in error, not appear to affect substantial rights. That is, not meet your burden of showing plain error when this wasn't raised below. Well, what I'm saying is, if you take Countryman's testimony away and just have the testimony of Bostick and Stanley, co-operators who are there and being paid essentially to testify, that would not necessarily get the government over the goal line. Okay, Mr. O'Byrne, while you're back at rebuttal. Mr. Kokos. May it please the Court, Donovan Kokos on behalf of the United States. I'd like to address the same two issues in the same order that Mr. Brogan addressed them. Regarding the wiretap issue, as set forth in my brief, I'm urging the Court to adopt for both Title III and to recognize for the state statute that the listening post concept informs the definition of an intercept. Didn't he acknowledge that? I thought that the issue is now clarified by argument is only whether the federal constitution limits the power of states to choose, as Pennsylvania has by its definition, to allow intercept of calls that are taking place even outside of the state. I think so. That's not the argument that I understood to be in the brief. It seems to have morphed a little bit, but yes. The reason I mention this is the listening post concept. Mr. Kokos, keep your voice up, particularly for Judge Greenberg. The listening post concept comes from the definition of intercept in 2510-4, but the statute that Mr. Brogan cites quite a bit, and I did address it in my brief, is 2518-3. I think you have to read that statute the way I'm about to, and you analyze it through the listening post concept. You will see, I think, that not only is the state's write-up statute constitutional, it's authorized by Title III, and so here's where I'm going with this. If you look at 2518-3, there are two sections to it. The section before the parenthetical authorizes any court, state or federal, to order an intercept as long as either the target or the listening post is in the jurisdiction. Now, the section that Mr. Brogan is citing is in the parenthetical, and that authorizes federal courts to order intercepts on mobile interception devices whether or not the device or the listening post is in the jurisdiction. The reason that matters is this situation falls within the first half of 2518-3, and we know from 2516-2 the states are required to follow both state and federal law. I read that as a reminder of the Supremacy Clause, almost a soft preemption type statute. It's essentially telling the states even though the federal law is not explicitly preempting or occupying the field, you can conflict with it. I think that's why if you're going to look at the state statute at all, you have to look at the federal statute to make sure that the state definition of an intercept doesn't conflict with the federal. That brings us around to the constitutional argument that he's making now, which I would answer just this, that unless Title III itself is unconstitutional, and I don't know that this section was ever held to be so, then I think the state of Pennsylvania had constitutional authority to define and intercept the way that it has to embrace the listening post concept. That's sort of where I come out on that. Now, I understand that he's also arguing the federal evidence is true of the poisonous tree. 2515 does codify Wong's son, but it requires the evidence to be derived from, the tainted evidence to be derived from some poisonous tree. If you look at this case, it's important to look at the affidavits, because as Mr. Brodin I think has conceded, there were exactly two state calls that we cited in one of our affidavits, the F affidavit only. The E affidavit he has no standing to object to anything because we never went up on his phones, the state never did, and none of his calls were intercepted. The F affidavit has two calls. Those are at pages 159 and 161 of his sealed appendix. You can see the text of them in my supplemental appendix at pages 648 and 664. If you look at those, those are four or five lines long. They're between Mr. Jackson and Mr. Brown, and they're in the nature of where are you, I'll be right over. That's it. If you apply a Frank's analysis to our wiretaps applications, and I think you need to see the whole ones and not just the excerpts that he's filed, because those remove a lot of RPC, you'll see that if you subtract out those two phone calls, there's still plenty of probable cause. What about the ungood faith as applied to Title III? Not necessarily that we reach the issue here, but it's sort of an interesting issue that seems to be unresolved. It is, and so in preparation for this hearing, I looked again to see whether any new cases had applied early on to Title III. I couldn't find any, but I found one I had overlooked. It's called the United States v. Butts, B-U-T-Z. It's a Judge Wright decision from the Ninth Circuit in 1992, I believe. So that's five circuits which have done it. I recognize the Sixth Circuit is the lone outlier in the Weiss opinion. The problem is that the Sixth Circuit, the logic doesn't really match with what's been happening in the Title III jurisprudential arena since 1968 when it was enacted. Specifically, the Sixth Circuit said, we're not going to apply early on to Title III because that's a judicially created modification of a remedy. I have two problems with that. One, the legislative history of Title III itself shows that Congress already anticipated that courts would be applying judicially created modifications through the impeachment exception, through the attenuation doctrine. And the other one is since Title III has been enacted, many courts, including this one in the unpublished Heilman decision, have applied flanks to Title III, another judicially created modification. So I think if the court gets this far, it needs to look carefully at those now five cases and contrast them with what the Sixth Circuit has said and then examine those in light of, I think, flanks. So that's all I have on the Title III wiretap issue. As to the Rule 701 issue, I preface it by saying this. As the court has noted, this is for review on plain error. On plain error review, the defendant has to meet all four prongs. He has the burden of persuasion on all four prongs. The Supreme Court said that in Vaughan in 2002. Do you concede there was error, that some of his testimony goes to things that have served the jury's role that were not particularly helpful to the jury and they were equally able to infer? So to answer that question, Mr. Brogan has cited in bullet point form at pages 32 and 33 of his brief 12 questions that he says were objectionable. But he doesn't match them to the testimony of those questions elicited, and that's curious to me because the testimony is the evidence, not the questions. So if you look at pages 101 to 102, 129 to 138, 163 to 176, and 215 and 216 of my supplemental appendix, you will see his answers to those questions. Now to answer your question, I think a few of the questions probably were interpreting things that weren't strictly speaking code, but in most of the cases, if not all of them, he was interpreting pronouns. He was describing vagaries of the phone calls themselves. So I don't know, of those 12, if you were to ask me how many of them I think usurped the role of the jury, honestly, I don't know. I mean, I would just ask the court to compare the questions to the answers. And bear in mind that the evidentiary foundation for them, his personal knowledge under 701A was set forth mostly at the outset of his testimony, and that's at pages 67 to 100 of the supplemental appendix. So it's many times when he's testifying, interpreting calls, detective countrymen would say things like, oh, I'm interpreting this call based on other calls you will hear, or I'm interpreting this call based on bus schedules or documents I reviewed. I don't see any basis for arguing that those were outside his precipient knowledge, because if you look at the first 33 pages of his testimony, detective countrymen was the person in charge of this. How about a pining on the feelings of people in the call, like that the caller is uncomfortable because she doesn't know him, or that the caller would rather that it was Dominic who was dealing with Arthur Brown. Those seem like the kinds of inferences that we would expect a jury to draw from the totality of the evidence. Do you agree that that overstepped what we might expect from a law enforcement officer under 701? To be candid with you, Your Honor, I'm not entirely sure, and here's why. So I worked with Fulton's decision. It's not entirely on point with what's happening here, because some of what was analyzed in Fulton, strictly speaking, wasn't really opinion testimony. What I looked at primarily as a counterpoint to Hampton was Judge Acuda's decision in Gadsden, and what she had noted was we trust the adversarial process to allow the jury to sort the weed from the chaff, bad opinions from well-informed opinions. Had Mr. Jackson's trial counsel objected to any one of the 12 questions that he now claims were objectionable at trial, the district court could have sorted that all out. Not only did he not do so, he defended the case on an entirely different theory. He argued that we somehow simulated his voice and planted it in the calls, and then in closing argument, for the first time ever, the veil parts, and he concedes there was a conspiracy, but now his theory is that everyone else was involved except Mr. Jackson. That's telling to me, because remember, we only have a handful of calls involving Mr. Jackson, so now suddenly the area of interpretation that he's really even caring about at trial narrows just to those six calls. I think this court in the Sine case, Judge Becker wrote this, I think, in 2002, S-Y-M-E. There's a footnote in there that says, this court will decline to exercise its discretion to correct even a plain prejudicial error on the fourth prong if there's evidence of sandbagging. I'm not accusing Mr. Brodin because he wasn't trial counsel or even trial counsel himself, because I think he employed a different, potentially better strategy to defend this case. But when someone comes into court on the Court of Appeals now and claims that, in essence, the entirety of our lay expert's testimony was usurping the role of the jury and was objectionable, I think the concerns about sandbagging do kick in. It's not like this is just one or two questions that are being objected to. In his brief, he drops 12 bullets, and then in footnote 18, he attempts to cover the rest by claiming these are just exemplary and not exhaustive. I submit to Your Honor that to correct this on plain error would not be addressing usurping the role of the jury through Detective Country in his testimony. It would be usurping the role of the district court to do that right now. Again, I just have to reiterate the importance of the court holding an appellant to the arguments he's made in his opening brief. It is even heightened now. It became heightened seven days ago because the brief I filed was over 13,000 words, and it's not that flabby, in my opinion. I could not file that brief today in this court. The reason it's so long, in large part, is I had to argue for each and every one of these four unpreserved errors what Mr. Jackson was supposed to argue, that he didn't argue it, the implications of his not arguing it, and then finally I had to point out why it wouldn't matter even if he had argued it because I can't rely on this court to apply Ghana every time that it really should. It seems like the court does it when it wants to, but when it's particularly interested by an issue, it just sort of shoves that aside and decides to reach it. And I would submit to Your Honors, respectfully, of course, that now that we are in this land of fewer words and I only get one brief, I can't rely on being called to argument. I haven't argued a case in this circuit in two and a half years. I've argued in the 11th Circuit since I've argued here. So I can't rely on having 15 minutes to speak to Your Honors to try to address the new things that a defendant will raise in a reply brief. I mean, I'm sorry, an appellant will raise in a reply brief. None was filed here anyway, or for the first time in oral argument. With that, I will yield the balance of my time. Thank you. Thank you, Mr. Rokokos. Mr. Brodin. I'm impressed with his ability to cite pages of the record. I'm impressed with his ability to cite. Mr. Rokokos used more notes today than he normally uses. Well, unfortunately, I don't have that skill, but be that as it may, I think to bring it back to the plain error issue with regard to the telephone calls, I mean, there's case after case. It's Hampton out of D.C. There's Dicker with Judge Greenberg was one of the judges on it back in 1988. The government knew or should have known that this testimony was invalid. To call countrymen repeatedly to the stand seven different times, I mean, that was how they advanced this trial. I mean, they would play some tapes. They'd call countrymen to stand. Exactly the same thing they were doing in Hampton. Hampton, they called the case agent five times. Here, they called the case agent seven times. So I don't think it's that much of a stretch to determine that this is plain error when the government keeps doing it again and again and again. You know, I thought of that. It occurred to me, if they keep doing the same thing, why isn't there an objection? I mean, why didn't the defendant object? Well, Your Honor, unfortunately, I was not the trial counsel, so he should have. There's no doubt about that. He should have. I thought when I read it that he didn't think he was being harmed by it. I used to try cases, and sometimes I'd see evidence that I didn't think was appropriate. But if I didn't think it hurt me, I wasn't objecting. Well, on several occasions, the trial counsel did, during cross-examination of countrymen, say, well, how do you even know this? And then countrymen would go on and explain it. So I certainly think the trial counsel had problems with some of countrymen's interpretation. But did he ask that they be stricken? No. I have to concede there was absolutely no objection after the fact or before the fact with the testimony. Unfortunately, that's why we're here on a plain error standard. But on the other hand, I think the government needs to know that calling the case agent seven times just to interpret phone conversations has been impermissible since 1988 in this circuit. Thank you. Thank you very much, Mr. Brodin. We thank both counsel for excellent arguments, and we will take the matter under advisement. It's an incredible story. We'll call the next case, Antonio Pearson versus Prison Health Service.